IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JENNIFER ALBERO** | : | |
| **Plaintiff,** | : | |
| v. | : | CIVIL NO. L-03-2425 |
| **CITY OF SALISBURY, et al.** | : | |
| **Defendants.** | : | |

## MEMORANDUM

Plaintiff, Jennifer Albero ("Albero"), a past employee of the Salisbury Zoo ("Zoo"), brought this Title VII employment discrimination suit against the City of Salisbury and James Rapp ("Rapp"), the Zoo's Director. Following discovery, defendants moved for summary judgment on the two remaining counts of the Complaint, which allege sexual harassment/hostile work environment (Count I), and retaliation (Count III).

Because the papers adequately address the issues, the Court will dispense with a hearing. As is more fully stated below, Albero's proof is legally insufficient to support her claims. With respect to Count I, Albero cannot establish that she was harassed "because of" her sex. Moreover, the Zoo's work environment, while crude, was not severe enough to be considered "hostile." With respect to Count III, Albero did engage in protected activity: filing a complaint of discrimination. The Zoo, however, took no adverse employment action against her in retaliation. Simply put, no fair-minded jury could find in her favor on any of her claims. In a separate Order, therefore, the Court will GRANT the defendants' motion for summary judgment and DIRECT the Clerk to CLOSE the case.

**I.   BACKGROUND**

Albero began working at the Zoo in 1986, when she was hired as a zookeeper. Climbing the ranks, she had been promoted to the position of Zookeeper III, or Senior Zookeeper, at the

time she was terminated. In December 2003, Albero took indefinite sick leave under the Family and Medical Leave Act due to a back injury she had sustained in March of that year. The Zoo terminated Albero in June 2004 after she informed the City, through her counsel, that she would seek disability retirement.[1]

Rapp became Zoo director in 1994. Albero appears to have gotten along well with her fellow employees and supervisors until 2001. As will be discussed, Albero and her co-workers socialized both on and off the job. Her employment grievances began in the fall of that year, when Carrie Samis ("Samis"), the Zoo's Education Curator, secured a job reclassification that carried a raise. Samis' raise upset Albero, who believed that Samis did not deserve one, and because no one else at the Zoo received a raise at that time. Albero alleges that Rapp singled out Samis for favoritism because he was involved in a sexual relationship with her. Albero contends that this relationship created a sexually hostile work environment.

In April 2003, Albero filed a grievance with the City complaining that her work environment at the Zoo was hostile. The City promptly assembled an investigative team, which interviewed six current and one former Zoo employee, including Albero, Rapp, and Samis.[2] The investigators compiled a five-page report wherein they made detailed findings as to each of

---

[1]   Letter from Paul Wilber to Kevin Tracy, Def. Ex. 61. (The correspondence is with Albero's attorney, because at this point, she had retained counsel). Albero went on paid FMLA leave in December 2003. Pursuant to City policy, she had to complete a functional capacity evaluation before returning to work. Even after the twelve-week paid leave had expired in April 2004, the City extended her leave status until she could complete the evaluation, in June 2004. Letter from Wilber to Tracy, Def. Ex. 56. The City was willing to accommodate Albero's schedule and choice of doctors, but required the evaluation to assess her ability to return to work. Id. In late April, Albero's counsel advised the City's counsel that Albero would not submit to the functional capacity evaluation in June. Letter from Tracy to Wilber, Def. Ex. 57. The City's attorney wrote back that the City would pay for the evaluation. Letter from Wilber to Tracy, Def. Ex. 58. In late May, Albero's counsel advised the City's counsel that Albero would seek disability retirement, and would drop her ADA claim. Letter from Tracy to Wilber, Def. Ex. 60.

[2]   Edward Cox, the City's Human Resources Director, and Bonita Fassett, a Pretrial Investigator for the Department of Corrections, were the grievance investigators. Deposition of Edward Cox, Def. Ex. 6, at 73-74. See also Investigation Report, Def. Ex. 18.

Albero's claims.[3] They found no evidence either that Rapp and Samis were having an affair or that Albero had suffered harassment. The investigators did, however, conclude that the work environment at the Zoo was crude and unprofessional. The Investigation Report states:

> An environment at the Zoo developed over the years that made acceptable discussions and jokes of a sexual nature. . . Sexually explicit language and pictures are not appropriate in the workplace. . . The investigators recommend that remediation occur to change the environment at the Zoo. . ."[4]

The investigators recommended disciplinary action against Rapp for condoning a "sexually explicit" environment.[5] In July 2003, The City issued Rapp a letter of reprimand and instructed him to develop a remediation plan.[6] By all accounts, Rapp took the reprimand to heart. He arranged for all Zoo employees, including himself, to attend a diversity training program. Albero does not allege that the "locker room" atmosphere persisted after the reprimand and the program.

Because the unprofessional atmosphere at the Zoo is at the heart of Albero's hostile work environment claim, it merits a detailed discussion. Albero contends that during working hours, employees frequently told "dirty" jokes. Other employees, including Samis, freely discussed their sex lives.[7] While on vacation, Samis sent a postcard that displayed nude buttocks to the Zoo, and another employee posted the card in the office.[8] During breaks Zoo employees sometimes watched *South Park*, a satirical, frequently off-color cartoon. Albero contends that one time, she viewed the internet history on a common-use computer and it contained the address

---

[3] Investigation Report, Def. Ex. 18.

[4] Id.

[5] Id.

[6] Letter of Reprimand, Def. Ex. 27.

[7] Albero's answers to Rapp's Interrogatories, Def. Ex. 23.

[8] Photocopy of postcard, Def. Ex. 6.5. The postcard was addressed to "Salisbury Zoological Park."

of a pornographic web site.[9] The name of the website was vulgar, but no pictures were displayed on the screen.

By her own admission, Albero was a willing participant in the workplace give-and-take.[10] She brought a pornographic video to work, which she showed for a few minutes.[11] She commented to fellow employees, at work, that her showerhead "satisfied" her better than her ex-husband.[12] She told sexual jokes, bragged of a boyfriend's physical "endowments," and participated in purchasing sexual "gag" gifts for colleagues, including edible underwear and an inflatable sheep.[13] On two occasions, she attended strip clubs with other employees after working hours.[14]

In support of her hostile work environment claim, Albero cites to a number of incidents that involved co-workers socializing after-hours and away from the Zoo. Albero states that she witnessed two of these incidents: Rapp once "mooned" fellow employees at a party;[15] another

---

[9] The defendants do not argue a failure to exhaust. Albero's allegations about co-workers, however, may be barred from consideration in this case. An employee cannot file a Title VII case until she has filed an EEOC charge, and the charge frames the scope of future litigation. In Chacko v. Patuxent Institution, the Fourth Circuit held that a plaintiff had failed to exhaust his administrative remedies when the charge referenced different time frames, actors, and discriminatory conduct than the "central factual allegations" in the suit. 429 F.2d 505, 506 (4th Cir. 2005). Chacko's EEOC charge complained of specific instances of "hostile treatment" from a supervisor, but at trial he presented evidence that his coworkers constantly subjected him to national origin epithets. Id. at 507-08. The Fourth Circuit reversed a jury verdict in favor of Chacko. In her EEOC charge, Albero contended only that she had been harassed by Rapp and Samis, and that she found their alleged sexual relationship offensive. She did not claim that any other employees harassed her. In this suit, the Court could consider Albero's claims if "a reasonable investigation of the administrative charge would have uncovered the factual allegations in the formal litigation." Id. at 512. The Court need not hypothesize about the scope of a reasonable EEOC investigation, however. With or without the actions of her co-workers other than Samis and Rapp, the alleged harassment does not amount to severe or pervasive conduct. See infra.

[10] See generally, Albero Dep., 125-142.

[11] Albero Dep. at 127, 133.

[12] Albero Dep. at 117.

[13] Albero Dep. at 140-141.

[14] Albero Dep. at 124.

[15] Jennifer Albero's answers to Zoo's interrogatories, Def. Ex. 9.

time, at a bar, he kissed the exposed nipple of a man.[16] Albero also cites incidents that she heard about, but did not witness. She heard that Rapp urinated on a car windshield outside a bar,[17] that Samis allegedly played spin-the-bottle with Zoo interns,[18] and that on a business trip Samis's boyfriend spent the night in a hotel room with her and another employee.[19]

The facts underlying Albero's retaliation claim are as follows. Soon after Samis's position was reclassified with a higher pay scale, Albero's relationships with Samis and Rapp became strained. In May 2002, Albero wrote a self-review that was part of her yearly evaluation: "My lack of enthusiasm due to selective, unwarranted raises to certain zoo employees. That creates loads of negativity in the workplace!"[20]

Gary Muir, Albero's direct supervisor, noticed her deteriorating attitude. When grading Albero during her May 2002 evaluation, he gave her a mixed review. Albero received good grades for her work with the animals. Nevertheless, she received low marks for "interpersonal skills"[21] and "professionalism."[22] A couple of days later, Albero met with Rapp about the evaluation, which she perceived as negative.[23]

---

[16] Jennifer Albero's answers to Rapp's interrogatories. Def. Ex. 23.

[17] Albero's answers to Zoo's interrogatories, Def. Ex. 9.

[18] Albero's answers to Rapp's Interrogatories, Def. Ex. 23.

[19] Deposition of Jennifer Albero, at 114-115. ("Albero Dep.")

[20] Employee Performance Appraisal, Def. Ex. 4. Albero had also complained of Rapp's favoritism toward Samis in a Workplace Questionnaire in January 2002, Def. Ex. 1.

[21] The commentary says, "Needs to be more positive and tolerant of others." (Def. Ex. 4).

[22] The commentary says, "does good animal work but attitude needs to improve (was originally a 3 but after discussion with Jim [Rapp] I agree with change [Muir])." Employee Performance Appraisal, Def. Ex. 4.

[23] Albero objected to her evaluation in a letter to Rapp, sent May 30th. (Def. Ex. 4). In the letter she objected that Rapp unfairly characterized her as a malcontent who "complain[s] about everything." It bears mention that Albero's complaints did not relate to sexual harassment. Instead she had criticized the Zoo's relationship with the public and the mistreatment of the animals.

Eight months later, in January 2003, Albero attended a "Counseling Session" with Rapp and Muir, at which she was counseled on her "antagonistic," "negative," and "hostile" behavior.[24] The "record of counseling" stated that she must "stop making disparaging and hurtful remarks about [her] co-workers and [her] Supervisors," and warned of disciplinary measures if she failed to comply.[25] She refused to sign the record of counseling.[26] Albero contends that no other employee had ever been given such a "mid-year evaluation," and that its purpose was to intimidate her.[27]

Two days later, Rapp issued a memo to all Zoo staff on "Workplace Standards" with rules ranging from the appropriate way to log telephone calls to wearing appropriate safety shoes.[28] In the fall of 2003, he told Albero she could not come in early without her supervisor's permission.[29]

On March 10, 2003, Albero filed a Charge Statement with the EEOC alleging sexual harassment and a hostile work environment.[30] She filed a grievance making similar allegations with the City a month later on April 15, 2003.[31]

On August 20, 2003, Albero filed the instant suit alleging, *inter alia*, sexual harassment/hostile work environment (Count I) and retaliation (Count III).[32] During this month,

---

[24]   Def. Ex. 10. In his deposition, Rapp explained that he scheduled the counseling session "because we identified things in the first evaluation in May [2002] that I don't think, really, we had seen that much improvement." Deposition of James Rapp, Def. Ex. 5, at 199. ("Rapp Dep.")

[25]   Record of Counseling, Def. Ex. 10.

[26]   Id.

[27]   Albero's answers to Zoo's interrogatories, Def. Ex. 9. She says it was to pressure her to "cease complaining about zoo management."

[28]   Memorandum Regarding Workplace Standards, Def. Ex. 11. Albero refused to sign a paper acknowledging receipt of this memorandum.

[29]   Memorandum from Jim Rapp to Jennifer Albero, Def. Ex. 34.

[30]   EEOC Charge Statement, Def. Ex. 15.

[31]   Grievance Letter, Def. Ex. 17.

she applied and interviewed for an Education Technician position, which would have placed her under Samis's direct supervision. The hiring committee consisted of Rapp, Samis, and a non-Zoo City employee, Alan Porianda. All three interviewed her. On September 15, 2003, Samis advised Albero by letter that she had not been selected.[33]

Starting in December 2003, Albero took sick leave under the Family and Medical Leave Act (FMLA), because of a back injury she had sustained in March 2003. At that time, Albero filed a second EEOC charge alleging violation of the Americans with Disabilities Act (ADA) and retaliation.[34] Albero then moved to amend her complaint in the instant suit to add a cause of action pursuant to the ADA. She withdrew it soon thereafter, however, and it is not an issue in this suit.

## III.   STANDARD

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

---

[32]   Her complaint also alleged intentional infliction of emotional distress, respondeat superior, and negligent supervision, but she withdrew those claims with the Court's permission. Count I and Count III are the only remaining claims.

[33]   Letter from Carrie Samis to Jennifer Albero, Def. Ex. 31.

[34]   Second EEOC Charge Statement, Def. Ex. 37.

7

**IV.   ANALYSIS**

With the factual background in mind, the Court now turns its attention to analyzing Albero's claims against the City of Salisbury.[35]

    **A.   Count I - Sexual Harassment**[36]

To succeed on a claim alleging a hostile work environment, Albero must show that: 1) she was harassed because of her sex; 2) the harassment was unwelcome; 3) the harassment was sufficiently severe or pervasive to create an abusive working environment, and 4) some basis exists to impute liability to the employer.  See Smith v. First Union Nat'l Bank, 202 F.3d 234 (4th Cir. 2000).   Even viewing the facts in the light most favorable to Albero, she does not provide evidence sufficient to meet any element of this test.

    1. "Because of" Albero's sex

Albero alleges facts that paint a picture of a sexually inappropriate work environment. This, without more, does not rise to the level of a Title VII violation, however.  Only harassment that occurs because of the victim's sex is actionable.  Hartsell v. Duplex Prod., Inc. 123 F3d 766,

---

[35] Albero sued Rapp individually.  Supervisors are not individually liable for Title VII violations. See Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 181 (4th Cir. 1998).  Rapp is entitled to summary judgment on that basis alone.

[36] In her Response to the Motion for Summary Judgment (Docket No. 33), Albero seems to include facts that allege a gender-based disparate treatment claim in addition to her claim for sexual harassment. Albero's complaint does not state a claim for disparate treatment, however.  Furthermore, many of her allegations involve the treatment of her female colleagues and not herself.  These allegations are irrelevant: "An individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance."  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004) (citing Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds* 527 U.S. 1031 (1999)).  Otherwise, Albero points to decisions made by the management that she felt deprived her of her authority as a Zookeeper.  These acts, however, are not in Title VII's purview.  The statute does not cover all "unfair or unprofessional" treatment, and does not "prohibit employment decisions based on other factors such as job performance, erroneous evaluations, personality conflicts or even unsound business practices."  Porter v. Nat'l Con-Serv, Inc., 51 F. Supp. 2d 656, 659-60 (D. Md. 1998) (citing Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1109 (8th Cir. 1998)).  The Court takes into account facts alleged about Albero's treatment as part of her hostile work environment claim, but finds that she has not produced evidence to survive summary judgment on a disparate treatment claim.

772 (4th Cir. 1997).   Title VII does not attempt to "purge the workplace of vulgarity." Hopkins v. Baltimore Gas & Elec., 77 F3d 745, 753 (4th Cir. 1996) (citing Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).   Albero has offered no proof that any of the behavior was directed towards her in specific, or intended to humiliate her, or was pointed at her because of her sex.  Many incidents that she points to in her pleadings occurred out of her presence.

Albero also alleges that the "special" relationship between Samis and Rapp supports her claim for a hostile work environment.  She provides no facts to support the assertion that Samis and Rapp had a sexual relationship, however.  Samis and Rapp both deny ever having an intimate relationship.[37]  No employee ever saw Rapp or Samis engaged in sexual or intimate behavior with each other.  There is neither real nor circumstantial evidence to support Albero's allegation.  Even viewing the facts in the light most favorable to Albero, she cannot rely on unsupported conjecture to defeat summary judgment.

Albero, therefore, has failed to allege facts sufficient to meet this prong of her *prima facie* case.  That alone is enough to defeat her claim.  Nevertheless, in viewing Albero's evidence, the Court finds that she is also unable to establish the other prongs of the Smith test.

    2.  "Unwelcome"

Conduct is "unwelcome" when it continues after the employee sufficiently communicates that it is unwelcome.  See Scott v. Ameritex Yarn, 72 F. Supp. 2d 587, 591 (4th Cir. 1999) (citing Meritor Savings Bank v. Vinson, 477 U.S. 57, 68-69 (1986)).   The Court must inquire "whether respondent by her conduct indicated that the alleged [sexual harassment was] unwelcome . . ." Meritor, 477 U.S. at 68.

Albero's own behavior is relevant in deciding "unwelcomeness."  See id. at 69.  The record shows that Albero was a willing participant in many of the episodes, e.g. discussing her

---

[37]    Rapp Dep. at 117; Deposition of Carrie Samis, Def. Ex. 8, at 38-39, 86.

9

own sex life, supplying a pornographic video, and giving sexually-oriented gag-gifts, that she contends were harassing.

Furthermore, there is no evidence that Albero complained about any of the alleged incidents until she filed her first EEOC charge in March 2003. The Zoo did not receive notice of the charge until June 2003.[38] In April 2003, she filed a grievance with the City. The City immediately launched an investigation at the Zoo with a team that included two outside investigators.[39]

Looking at the totality of the circumstances, Albero has failed to present evidence from which a reasonable jury could find that the allegedly harassing behavior was "unwelcome."

### 3. "Severe and Pervasive"

"To be actionable, sexual harassment must be sufficiently 'severe and pervasive' to alter the conditions of employment and create an abusive working environment." Raley v. Bd. of St. Mary's Cty Comm'rs, 752 F. Supp. 1272, 1281 (D. Md. 1990). The standard is both objective and subjective: a reasonable person would find the environment hostile and abusive, and the plaintiff "in fact perceived it to be so." Faragher v. City of Boca Raton, 524 U.S. 775 at 787 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). To make this determination, the Court must examine: (i) the frequency of the discriminatory conduct; (ii) the severity of the conduct; (iii) whether the conduct is physically threatening or humiliating, and (iv) whether the conduct unreasonably interferes with the employee's work performance. Id. at 787-88.

Albero does not allege that Rapp or anyone else at work propositioned her, touched her inappropriately, or made sexual comments in an effort to humiliate her because they knew she

---

[38] EEOC Notice of Charge of Discrimination, Def. Ex. 15.

[39] As described above, their report, filed in June, found a sexually inappropriate environment at the Zoo, but did not substantiate any of Albero's claims. Nevertheless, Zoo management recommended that Rapp be reprimanded for allowing the inappropriate environment.

10

would be offended.  Nor does she allege that her female colleagues were subjected to such direct misconduct.

Offensive touching or propositioning is not required, however, for a hostile work environment.  A worker cannot be forced to endure an atmosphere freighted with sexual references and inappropriate sexual content.  See e.g. Meritor, 477 U.S. at 73 (finding a cause of action for hostile work environment claims when there had been no tangible employment action).  If that is the complaint, however, then the sexual overlay must be pervasive and severe.  Isolated incidents are not enough.  Here, Albero does not say how frequently the objectionable conduct occurred.  In other words, she does not attempt to meet the pervasiveness requirement.  Her examples come from the 18 years during which she worked at the Zoo.  She is vague about dates, and it is unclear whether these incidents were an everyday occurrence or relatively rare.  Nor has she shown that the conduct was particularly severe.  Moreover, Albero not attempted to show that any of this activity was threatening or humiliating, or that it interfered with her work performance at all.

By requiring that the misconduct must be "severe and pervasive," the Supreme Court sought to prevent Title VII from becoming a "general civility code."  Farragher, 524 U.S. at 788.  This prong of the test is meant to "filter out. . . the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. (internal citations omitted).  Again, Albero is unable to produce evidence sufficient to meet this part of her *prima facie* case.

### 4. Liability imputed to employer

In a hostile work environment claim, liability is generally imputed to the employer. Faragher 524 U.S. at 807.  The employer may, nevertheless, show as an affirmative defense that it "exercised reasonable care to avoid harassment and to eliminate it when it might occur," and

that the employee failed to act with "reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." Id. at 805.

While not dispositive, an employer's adoption of an anti-harassment policy is important proof that the employer did exercise reasonable care. Smith, 202 F.2d at 244. The City of Salisbury had in place both a sexual harassment policy and a grievance procedure.[40] Albero has not provided any evidence that the City adopted that policy "in bad faith," or that the policy was "otherwise defective or dysfunctional." See id. at 245 (citing Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999)).

Albero did not take advantage of the City's grievance procedures until April 2003, many months, even years, after the instances of "harassment" of which she complains. She did not, the Court notes, file a grievance until after she had already filed an EEOC charge which contained the same allegations. Until that point, she failed to take advantage of the corrective opportunities the City provided. Her actions do not show "reasonable care to take advantage of the employer's safeguards."

Promptly upon the receipt of Albero's grievance letter, the City took steps to investigate her allegations. Although the investigation did not substantiate any of Albero's claims, Rapp was reprimanded for allowing an inappropriate work environment. In addition, the Zoo made sure its employees all had copies of the anti-harassment policy.

Albero has not produced any evidence from which a reasonable jury could find that Rapp sexually harassed her, or condoned sexually harassing behavior directed at Albero by her co-workers. She also cannot overcome the City's affirmative defense to liability. Accordingly, summary judgment will be granted as to Count I.

---

[40] City of Salisbury Maryland Employee Handbook, § 0610, § 0903, § 0904.

**B. Count III- Retaliation**

To make a *prima facie* case for retaliation, Albero must produce evidence from which a reasonable jury could find that (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) that a causal connection existed between the protected activity and the asserted adverse action.  Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

Albero makes two different retaliation claims.[41]  The first is that she was subject to retaliatory harassment after she filed her first EEOC charge.[42]  The second is that she was denied the education technician position in retaliation for filing the EEOC charge.  Filing the EEOC charge unequivocally meets the first prong of the *prima facie* case.  The Court will analyze the remainder of the test with respect to both allegations.

      1. Harassment

A claim of retaliatory harassment requires a plaintiff to show "evidence of conduct 'severe or pervasive enough' to create 'an environment that a reasonable person would find hostile or abusive.'"  Von Gunten v. Maryland, 243 F.3d 858, 869-70 (4th Cir. 2001) (quoting Harris, 510 U.S. at 21).

As with her hostile work environment/sexual harassment claim, Albero is unable to show that any allegedly retaliatory harassment was "severe and pervasive."  She had a mediocre

---

[41]    In her response to the motion for summary judgment, (Docket No. 33), Albero seeks to sweep into her retaliation claim conduct that occurred relating to her back injury.  For example, she cites the City's request that she take leave under the FMLA and her termination in July 2004 as retaliatory conduct.  These disputed matters, however, relate to her 2003 back injury and her ability to perform her work duties after that injury.  Accordingly, the only potential "causal connection" is between that conduct and her ADA claim, which Albero withdrew from this case.  The Court, therefore, will not consider them and offers no opinion as to whether the ADA proscribes those actions.

[42]    In her first EEOC charge, Albero alleged retaliation for complaining about the treatment of animals at the Zoo.  This behavior is not protected under Title VII.  The Court also notes that in her retaliation claim, Albero is not alleging retaliatory sexual harassment.  Management disallowed all inappropriate behavior after Albero filed her grievance.  Albero contends that Rapp and others deliberately made her working environment more difficult.

employment evaluation and a counseling session to address her negative attitude.  Rapp also promulgated new rules with which all employees had to comply.  She was reprimanded once for not speaking to her fellow employees.  Even taken together, these incidents do not meet the requirement that the retaliatory behavior be "severe and pervasive."[43]

Essentially, Albero is asking the Court to step in to second-guess managerial decisions, which the Court cannot do.  Many of Albero's allegations "can be attributed to an increase of predictable tension in an office after a discrimination charge is filed.  This is not an adverse employment action."  Raley, 752 F.Supp. at 1281.

      2. The Education Technician position

An adverse employment action includes any retaliatory act, but only if that act results in an adverse effect on the "terms, conditions, or benefits" of employment.  Von Gunten, 243 F.3d at 865.

Albero fails to make showing.  She wished to make the lateral transfer to the Education Technician position.[44]  Not being chosen for the position, however, had no effect on the terms, conditions, or benefits of her job as a Zookeeper.  She continued to be a Senior Zookeeper, under the same terms, conditions, and benefits she had previously enjoyed.[45]  Count III, therefore, cannot survive summary judgment and will be dismissed.

---

[43] Neither the mediocre evaluation nor the counseling session that followed constitutes an adverse employment action.  Neither had an effect on the terms, benefits, or condition of her employment.  For example, Albero was not demoted or denied a raise because of them.  Moreover, these two events occurred between January 2002 and January 2003, before she filed her EEOC charge and grievance letter.  Accordingly, they cannot be said to be in retaliation for her complaints of sexual harassment.  Nor do Albero's complaints in the January 2002 Workplace Evaluation and in her May 2002 self-review qualify as "protected activity" under Title VII.  She complained of favoritism, but made no allegations of sexual harassment or gender discrimination.  Making general workplace complaints is not protected activity.

[44] It does not appear that this position was a promotion.  The pay was $10,000 less than what Albero was making as a Senior Zookeeper.  Advertisement for Education Technician position, Def. Ex. 22.

[45] Even assuming, *arguendo*, that this was an adverse employment action, Albero cannot show that the failure to hire her was retaliatory.  Once a plaintiff has shown an adverse employment action, the burden shifts to the employer to show a legitimate, non-retaliatory reason for not hiring her.  See Smith,

## V.  CONCLUSION

For the foregoing reasons, the Court will, by separate Order, GRANT Defendant's Motion for Summary Judgment and DIRECT the Clerk to CLOSE the case.


Dated this 27th day of March, 2006

                                                            /s/
                                        Benson Everett Legg
                                        Chief Judge

---

202 F.2d at 248. The plaintiff must then show that reason is pretextual by demonstrating "*both* that the reason was false *and* that [retaliation] was the real reason for the challenged conduct." Id. (emphasis added; internal citations omitted).  The hiring team stated that the woman they hired was the most qualified for the position: she has a bachelor's degree, teaching experience, and enthusiasm for working with the public.  Had Albero gotten the position, Samis would have been her supervisor.  Samis also felt that her past personality conflicts with Albero weighed against Albero's candidacy.  In addition, Albero stated in the January 2002 Workplace Questionnaire (Def. Ex. 1) that working with the public was the aspect of her job that she disliked the most.  Working with the public was at the core of the Education Technician position.  Albero has not shown that these legitimate reasons were merely a pretext for retaliation.